**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FRANCISCO BACA ) | |
| 14428 Misty Point Ct ) | |
| El Paso, TX 79938 ) | |
| ) | |
|             Plaintiff,         ) | |
| ) | |
|             v.                 ) | |
| ) | |
| PETE HEGSETH, in his official capacity as ) | |
| Secretary of Defense ) | |
| 1000 Defense ) | |
| Pentagon ) | |
| Washington, D.C. 20301-1000 ) | Case No. 25-cv-1713 |
| ) | |
| DANIEL P. DRISCOLL, in his official ) | |
| capacity as Secretary of the Army ) | |
| 101 Army ) | |
| Pentagon ) | |
| Washington, D.C. 20310-0101 ) | |
| ) | |
| UNITED STATES DEPARTMENT OF ) | |
| DEFENSE ) | |
| 1000 Defense ) | |
| Pentagon ) | |
| Washington, DC 20301-1000 ) | |
| ) | |
|             Defendants.        ) | |

**COMPLAINT FOR JUDICIAL REVIEW AND DECLARATORY RELIEF**

1.      This is an action under the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.*

("APA"), for judicial review of a decision by the DoD Physical Disability Board of Review

("PDBR") upholding the erroneous decision of the Physical Evaluation Board ("PEB") that the

Plaintiff, U.S. Army Veteran, Francisco Baca ("Mr. Baca"), be removed from the Temporary

Disability Retirement List ("TDRL") with just a 10% disability rating for his unfitting Crohn's

disease despite the fact that his condition had not changed or stabilized since he was placed on the TDRL in June 2004.[1]

2.      With less than a 30% rating for his unfitting condition, Mr. Baca medically separated from the Army on August 17, 2005, due to his Crohn's disease.

3.      Less than a year before his medical separation, the Department of Veterans Affairs ("VA") reviewed Mr. Baca's condition using the VASRD and found him to be 30% disabled due to his Crohn's disease.  Since his separation from the Army, Mr. Baca has received constant care for his Crohn's disease exacerbations, which he continues to struggle with to this day.

4.      Mr. Baca appealed the PEB's findings to the PDBR to increase his disability rating to no less than 30%, consistent with the VASRD rating criteria, which would entitle him to a disability retirement rather than an administrative medical separation.

5.      The PDBR unlawfully upheld the PEB's 10% rating by ignoring relevant facts and failing to apply the required law.  The PDBR arbitrarily and capriciously overlooked substantial evidence, including the facts that: (1) Mr. Baca received a VA rating award of 30% less than 12 months before his separation from the Army; (2) Mr. Baca's VA examination suggested his Crohn's disease was not stable for rating purposes; (3) Mr. Baca's TDRL examination recommended follow-up care; and (4) Mr. Baca experienced repeated Crohn's disease exacerbations following his removal from the TDRL.

---

[1] As discussed in greater detail below, if the PEB determines that a service member is unfit for service, it assigns the member a disability rating (a percentage from 0 to 100) based on the Department of Veterans Affairs Schedule for Rating Disabilities ("VASRD").  A service member who is assigned a combined disability rating of 30% or more is considered medically "retired" and eligible for significant lifetime benefits.  A service member who is assigned a combined disability rating of 20% or less is medically "separated," and receives a one-time lump-sum severance payment.

6.      The PDBR's decision that Mr. Baca did not merit a higher permanent disability rating was arbitrary, capricious, unsupported by substantial evidence, unwarranted by the facts, and otherwise not in accordance with 10 U.S.C. § 1216a.  Following the issuance of its decision in the Plaintiff's case, the PDBR ceased operations, effective October 1, 2024, and responsibility for all pending or future cases previously eligible for PDBR review was transferred "to the Secretary of the Military Department concerned for assignment to their respective Board of Correction for Military/Naval Records." Memorandum for Secretaries of the Military Departments, SUBJECT: Sunset of Physical Disability Board of Review, Jul. 9, 2024.

7.      As a result of the PDBR's arbitrary, capricious, unsupported, and otherwise unlawful decision, Mr. Baca has been deprived of the permanent disability retirement benefits to which he has been lawfully entitled since August 2005.  Mr. Baca seeks, among other relief, an order under 5 U.S.C. § 706 setting aside the PDBR's decision remanding to the agency with a finding that the decision was arbitrary, capricious, and contrary to law.

## JURISDICTION AND VENUE

8.      This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because this civil action arises under the laws of the United States. Mr. Baca seeks relief under the APA, 5 U.S.C. § 701 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.  Therefore, subject matter jurisdiction exists under 28 U.S.C. § 1331 to challenge the PDBR's final administrative decision under the Administrative Procedures Act ("APA"), 5 U.S.C. § 702 *et seq.,* since the decision was issued within the last six years (January 18, 2022).

9.      Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because Defendants' principal offices are located in and their official duties are conducted within this judicial district. Due to the disbandment of the PDBR, responsibility for this case has been transferred to the

3

Secretary of the Army.  Memorandum for Secretaries of the Military Departments, SUBJECT: Sunset of Physical Disability Board of Review, Jul. 9, 2024. Venue is also proper under 5 U.S.C. § 703 because this is a Court of competent jurisdiction.

## PARTIES

10.     Mr. Baca served honorably in the U.S. Army from the years 1997 through 2004, when he was placed on the TDRL due to his medically unfitting condition.  He was later medically separated off the TDRL in 2005 with an honorable discharge.  He is a citizen of the United States and currently resides in El Paso, Texas.  Throughout his service, Mr. Baca was a member of a regular component of the armed forces entitled to basic pay, and he is thus an eligible member as required for disability retirement under the Career Compensation Act of 1949. 10 U.S.C. § 1201(a), (c).  Defendant Pete Hegseth is the United States Secretary of Defense.  He is the chief officer of the Department of Defense, and exercises authority, direction, and control over the Department of Defense.  Upon information and belief, Defendant Hegseth performs a significant amount of his official duties within this judicial district at the Pentagon.

11.     Defendant Daniel Driscoll is the United States Secretary of the Army.  He is the chief officer of the Department of the Army, and exercises authority, direction, and control over the Army including the Army Board Correction of Naval Records.  Upon information and belief, Defendant Driscoll performs a significant amount of his official duties within this judicial district at the Pentagon.

## THE GOVERNING LEGAL FRAMEWORK

### *The Army Disability Evaluation System*

12.     Chapter 61 of Title 10 of the United States Code establishes the process through which the Army discharges disabled service members.  That chapter authorizes the PEB to

discharge military personnel who are found to be unfit for continued military service due to physical or mental disability.

13.     The process for evaluating a service member's fitness for duty because of a possible disability is typically triggered when a concerned commanding officer or military physician refers the service member to a Medical Evaluation Board.  *See* Army Regs. 635-40, 40-501.  The Medical Evaluation Board examines the service member, documents the member's medical status and limitations, and determines whether the member's condition meets the medical standards to remain in active service.  Army Reg. 635-40 ¶¶ 4-7, 4-12.  If the Medical Evaluation Board determines that the service member's condition does not meet the retention standards, the Medical Evaluation Board refers the member's case file to a Physical Evaluation Board (PEB).  *See id.* ¶¶ 4-12f, 4-19; *see also* 10 U.S.C. § 1222(b)(1)(A).

14.     The PEB evaluates the service member and makes findings and recommendations about the member's fitness for duty and statutory eligibility for benefits.  *See* Army Reg. 635-40 ¶ 4-19.  If the PEB determines that the service member's condition is stable and permanent, but that the service member remains unfit for service, it must assign the member a disability rating that determines whether he or she qualifies for disability benefits under either retirement or separation.  *See id.*  The PEB's determination—and the relevant Secretary's ultimate determination—must consider all medical conditions, whether individually or collectively, that render the member unfit to perform his or her duties.  *See* 10 U.S.C. § 1216a; Army Reg. 635-40 ¶¶ 4-12f, 4-22b(1); *see also* DoD Instruction 1332.38, encl. 3, pt. 1.  And any reasonable doubt about the rating of a disability must be resolved in the service member's favor.  38 U.S.C. § 5107(b); 38 C.F.R. §§ 3.102, 4.3.

15.     When the PEB determines that a service member is unfit for military service, the service member is either (1) medically separated pursuant to 10 U.S.C. §1203; (2) permanently retired under 10 U.S.C. § 1201; or (3) placed on the temporary disability retired list ("TDRL") pursuant to 10 U.S.C. § 1202.  This determination turns on the service's member specific disability and assigned disability rating, a value between 0% and 100% (set in increments of 10%) that is assigned using the VASRD.  *Id.* § 1201(b)(3).

16.     If the Army assigns the service member a combined disability rating of 20% or less, the service member is medically separated with a lump-sum severance payment.  *See id.* 1203(a), (b)(4).  But if the Army assigns the service member a combined disability rating of 30% or more, the service member is medically retired.  *See id.* § 1201.  Service members who are medically retired receive significant lifetime benefits, including access to military bases, commissary privileges, the right to wear their uniform on appropriate public occasions, "space-available" travel on military aircraft, and burial privileges in national cemeteries.  *See, e.g.*, 32 C.F.R. § 199.17; DoD Instruction 1330.17, encl. 2 ¶ 3(c)(1); DoD Instruction 4515.13 § 4.8(q).

17.     To qualify a service member for medical retirement, the member's disability must also be "of a permanent nature" and "stable."  10 U.S.C. § 1201(b)(1).  (Medical separation has the "permanent nature" requirement, but not the "stable" requirement. *Id.* § 1203(b)(3).)

18.     According to DoD, a disability is "unstable" if the "preponderance of medical evidence establishes that accepted medical principles indicates the severity of the condition will change within the next five years so as result in an increase or decrease of the disability rating percentage or a finding of it."  *See* DoD Instruction 1332.38, encl. 3, pt. 6.  If a service member would be qualified for medical retirement but-for the fact that it cannot be determined that the

member's disability is "stable," then the member is placed on the "temporary disability retired list" with retirement pay.  10 U.S.C. § 1202.

19.     Service members on the temporary disability list must undergo an examination at least every 18 months to "to determine whether there has been a change in the disability for which he was temporarily retired."  10 U.S.C. § 1210(a).  And a service member must be either permanently retired or separated within five years of placement on the temporary disability list. *See id.* § 1210(b) (1999); *see also* DoDI Instruction 1332.38, encl. 3 pt. 6.

### *The Physical Disability Board of Review*

20.     In 2008, Congress created the Physical Disability Board of Review and charged it with reviewing the decisions of PEBs on appeals by service members who were discharged between September 11, 2001, and December 31, 2009, with a disability rating of 20% or less.  *See* National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1643, 122 Stat. 3, 465-67 (2008) (codified as 10 U.S.C. § 1554a).  Congress established the PDBR "to address the disparities in the disability ratings issued by the military departments in [DoD] and the VA."  *U-Ahk- Vroman-Sanchez v. U.S. Dep't of Def.*, No. 19-cv-3141, 2021 WL 394811, at *2 (D.D.C. Feb. 4, 2021) (citing *Adams v. United States*, 117 Fed. Cl. 628, 665-70 (2014)).

21.     The PDBR's creation was part of a larger overhaul of DoD's disability system that was prompted by the disturbing fact that "the military, across all branches, consistently rated service members significantly lower than the VA."  *Adams*, 117 Fed. Cl. at 665-70 (citing and discussing legislative history).  In 2007, the Congressional Veterans' Disability Benefits Commission reported that an extensive analysis of tens of thousands of DoD and VA ratings issued between 2000 and 2006 revealed that "the combined disability ratings made by VA are higher, on average, than the combined ratings made by the services at almost all rating levels." Vets.'

Disability Benefits Comm'n, *Honoring the Call to Duty: Veterans' Disability Benefits in the 21st Century* 262 (Oct. 2007), https://apps.dtic.mil/sti/pdfs/ADA473681.pdf/.

22.    While testifying on the issue before the Senate Committee on Armed Services and Veterans Affairs, an Army General observed that "DoD has [a] strong incentive to assign ratings less than 30% so that only separation pay is required and continuing family health care is not provided." *Adams*, 117 Fed. Cl. at 665-66 (citation omitted); *see also Honoring the Call*, *supra*, at 267 ("there appears to be some incentive on the part of the services to assign ratings less than 30 percent so that only separation pay is required and continuing family health care and other retirement benefits are not provided").

23.    The PDBR was thus created to be "an independent board to review" and "correct unjustifiably low Department of Defense disability ratings awarded since 2001." 153 Cong. Rec. at 20,342.

24.    Consistent with that purpose, the PDBR will "reassess the accuracy and fairness of the combined disability ratings" for eligible service members. DoD Instruction 6040.44 ¶ 3a. In its review, the PDBR must use the VA's Schedule for Rating Disabilities (VASRD) in effect at the time of the service member's separation and may not consider any regulations or guidelines inconsistent with the VASRD. *See id.*, encl. 3 ¶ 4f. Service members may also submit additional evidence for the PDBR's consideration. 10 U.S.C. § 1554a(c)(2).

25.    When the PDBR reviews a PEB decision involving a service member who has a competing disability rating assigned by the VA, the PDBR must consider that VA rating, "particularly if the VA rating was awarded within 12 months of the former Service member's separation." DoD Instruction 6040.44, encl. 3 ¶ 4a(5)(b). And if "there is a question as to which of [the] two evaluations shall be applied," the PDBR must assign the higher rating "if the disability

picture more nearly approximates the criteria required for that rating." 38 C.F.R. § 4.7. The PDBR must likewise resolve any reasonable doubt about the service member's disability rating in favor of the service member. *Id.* §§ 3.102, 4.3. Upon completing its review, the PDBR may issue a recommendation to the Secretary of the Army about whether to (1) change the service member's separation to retirement; (2) increase the disability rating assigned by the PEB; or (3) issue a new disability rating. 10 U.S.C. § 1554a(d). The PDBR's issuance of such a recommendation authorizes the Secretary to make the corresponding correction to the service member's record. *Id.* § 1554a(e). "If the PDBR 'makes a recommendation not to correct the military records,' its recommendation is final." *Sissel v. Wormuth*, 77 F.4th 941, 944 (D.C. Cir. 2023). "At that point, if the [veteran] remains dissatisfied with the Secretary's determination, he may seek judicial review under the Administrative Procedure Act." *Id.*

### *The Relevant VASRD Provisions*

26.     Disability ratings are determined by applying a schedule of ratings that is based on average impairment of earning capacity. Separate diagnostic codes identify the various disabilities. *See* 38 U.S.C. § 1155; 38 C.F.R., Part 4.

27.     Mr. Baca's disability, Crohn's disease, is an unlisted condition. The VASRD provides that when "an unlisted condition is encountered, it may be evaluated under a closely related disease or injury in which not only the functions affected, but the anatomical localization and symptomatology are closely analogous." 38 C.F.R. § 4.20. Therefore, Mr. Baca's Crohn's disease was evaluated by analogy under 38 C.F.R. § 4.114, Diagnostic Code 7323, the code for ulcerative colitis. Pursuant to Diagnostic Code 7323, a 10 percent rating is warranted for moderate symptoms with infrequent exacerbations; a 30 percent rating is warranted for moderately severe symptoms, with frequent exacerbations; and a 60 percent rating is warranted for severe symptoms,

with numerous attacks a year and malnutrition, with only fair health during remissions.  38 C.F.R. §§ 4.20, 4.114, Diagnostic Code 7323.  Although undefined by the VASRD, the VA's Disability Benefits Questionnaire defines exacerbations as "frequent episodes of bowel disturbance with abdominal distress" and may include symptoms like abdominal pain, bloating, constipation, diarrhea, vomiting, and nausea, suggesting that "frequent exacerbations" falls short of malnutrition and hospitalization.

28.     The VASRD requires that the examiner determining the agency's rating decision must "interpret reports of examination in the light of the whole recorded history, reconciling the various reports into a consistent picture so that the current rating may accurately reflect the elements of disability present.  Each disability must be considered from the point of view of the veteran working or seeking work."  *Id.* § 4.2.

29.     Moreover, all reasonable doubt must be resolved in the claimant's favor.  *Id.* § 4.3. Where there is a question about which of two disability evaluations shall be applied, the higher evaluation is to be assigned if the disability picture more nearly approximates the criteria required for that rating.  *Id.* § 4.7.

## FACTUAL ALLEGATIONS

### *Mr. Baca's Battle With Crohn's Disease During His Service*

30.     Mr. Baca joined the Army on August 22, 1997.  Two years later in 1999, he developed and was diagnosed with Crohn's disease, which caused him ongoing, debilitating symptoms on an ongoing basis including postprandial pain, diarrhea, nausea, vomiting, difficulty with oral intake, weakness, and fatigue.  At the time of his diagnosis, he also suffered from depression and an anxiety disorder, which further exacerbated his Crohn's disease symptoms.

31.     In June 2002, Mr. Baca's symptoms improved when he started a new medication regimen of 6-MP and prednisone sparing.  With the improvement in his symptoms, Mr. Baca's

body was able to absorb nutrients, and his weight improved. His improved condition also allowed him to deploy to Iraq in March 2003. However, by December 2003, Mr. Baca's Crohn's disease flared up again and became duty-limiting. His Crohn's exacerbations at this time included diffuse abdominal pain, frequent cramping, liquid bowel movements, hematochezia, chills, and frequent vomiting with oral intake (malabsorption), along with malaise, weakness, and fatigue. Like his previous bout with Crohn's disease, Mr. Baca's depression and anxiety made the symptoms worse. Even though he started prednisone again, he continued to suffer from abdominal pain, nausea, vomiting, cramping, weakness, fatigue, weight loss, and oral intolerance, leading to two hospitalizations in April 2004.

### *Mr. Baca's Medical Evaluation Board Findings*

32.     After he was discharged from these hospitalizations in 2004, Mr. Baca continued to experience abdominal pain intensified by food, nausea, intermittent vomiting, and diarrhea. Mr. Baca was referred into the Disability Evaluation System (DES) process. In May 2004, a Medical Evaluation Board (MEB) recommended Mr. Baca's referral to the PEB, because his severe Crohn's disease, together with his coexistent depression and anxiety disorder (mood disorder), made him unable to perform the duties of an active duty Soldier. The MEB's report noted that Mr. Baca's Crohn's disease "could very well progress in severity and symptomology." A June 2004 MEB addendum indicated that Mr. Baca had moderate Crohn's disease with daily abdominal pain and chronic diarrhea despite medication. The addendum noted that Mr. Baca's disease was a "lifelong illness with unpredictable periods of debilitating and incapacitating symptoms. Multiple relapses are the norm." The addendum indicated that Mr. Baca's anxiety and depression exacerbated the symptoms of his disease. The addendum also listed the following active medications for Mr. Baca: Mesalamine, Prevacid, Klonopin, Flagyl, and Mercaptopurine.

### Mr. Baca's Placement on the TDRL With a 30% Rating

33.    The PEB found Mr. Baca unfit for duty for his Chron's disease manifested by abdominal pain, bloody diarrhea, fatigue and weakness with significant weight loss, bloody diarrhea, fatigue and "significant symptoms of adjustment mood disorder with depression and anxiety." the PEB awarded his condition a 30% rating because his disease manifested "by abdominal pain, bloody diarrhea, fatigue and weakness with significant weight loss."  Mr. Baca's "prolonged hospitalizations" and treatment including prednisone, 6 Mercaptopurine and antidepressant therapy also supported the PEB's 30% rating.   At that time, the PEB stated that his impairments "are such that a permanent evaluation is not yet possible."  The PEB noted that Mr. Baca's mood disorder was not separately rated due to it being "caused by the primary condition (Chron's disease).  The PEB further concluded that Mr. Baca's Chron's disease was not yet stable for ratings purposes and that his placement on the TDRL was required.

34.    Mr. Baca concurred with the PEB's findings and was temporarily retired on August 11, 2004.

### Mr. Baca's 30% VA Disability Rating Due to Crohn's Disease

35.    Immediately following his discharge from the Army, Mr. Baca applied for VA benefits.  On September 13, 2004, he underwent a VA Compensation and Pension (C&P) exam where the examiner indicated his Crohn's disease was marked by "remissions and exacerbations of Crohn's disease *and* he was admitted many times to the emergency room and sometimes admitted to the hospital … In between flareups he feels better … He is around 147 pounds.  Normal stools occur in one day around seven times. There have been no fevers, chills or blood in stool in the last few months. The last time he had blood in the stool was around January of 2004." (Emphasis added).

36.    Based on Mr. Baca's service treatment records and C&P exam, the VA awarded him a 30% disability rating effective from discharge due to the fact that his Crohn's disease manifested in "frequent exacerbations," e.g., frequent episodes of abdominal pain, bloating, constipation, diarrhea, vomiting, and nausea.

### Mr. Baca's Medical Condition While on the TDRL and His TDRL Exam

37.    In February 2005, Mr. Baca visited the El Paso VA where he reported to his physician that he had "some pain in the abdomen on occasion."  At this visit his medical provider noted he was on four medications for his Crohn's Disease: Mesalamine, Mercaptopurine, Dicyclomine, and Protonix.

38.    Four months later, on June 28, 2005, Mr. Baca reported for his TDRL exam.  Very little information was recorded during this exam.  The TDRL examiner reported that at the time of his examination Mr. Baca weighed 154 pounds, was "pain free," had "no recent weight loss, no abdominal pain, no bright red blood per rectum, no diarrhea," and took 1.2 grams of mesalamine and 2 tabs of mercaptopurine to control his Crohn's Disease.  However, the exam was silent as to the number and frequency of exacerbations manifested by abdominal pain, bloating, constipation, diarrhea, vomiting, and nausea.

39.    The TDRL examiner recommended that Mr. Baca report to the gastroenterology clinic again in four months.

40.    On July 26, 2005, less than one month after his TDRL examination, Mr. Baca reported to the emergency room with pain in the right upper quadrant that began a week earlier and was accompanied by vomiting and diarrhea, resulting in a diagnosis of appendicitis, which

can be caused by Crohn's disease.  At the time of his appendicitis diagnosis, Mr. Baca's weight was recorded as 139.8 pounds, close to 15 pounds less than he weighed a month earlier.[2]

### Mr. Baca's Removal From the TDRL WITH A 10% Rating

41.    On August 17, 2005, Mr. Baca was removed from the TDRL and medically separated with a 10% rating for his Crohn's disease.  The Army PEB reported that Mr. Baca was awarded a 10% rating due to the fact that his "Crohn's disease [was] under good control with 2 oral medications.  No hospitalizations, relapses, weight loss or anemia since entering TDRL status. Present imagining and labs normal."

### Mr. Baca's Continued Battle with Crohn's Disease Since Removal from the TDRL

42.    As with his previous periods of remission, any relief Mr. Baca experienced from his Crohn's disease symptoms did not last, and his condition did not permanently stabilize.  Around October 22, 2005, Mr. Baca went to an appointment at the Phoenix VA and reported that his "stomach always bothers him."  He also reported at this appointment that he had "chronic nausea, vomiting, diarrhea, or constipation" and "unplanned … weight loss."

43.    Mr. Baca went back to the Phoenix VA in December 2005 for a gastroenterology consultation. The medical notes Mr. Baca kept from the visit indicate that he was currently suffering from "active" moderate  Crohn's disease involving the small and large intestine despite treatment with steroids, antacids, and pain killers.  The examining physician at this appointment also chronicled Mr. Baca's experiences with Crohn's disease including that he: (1) required 12 hospitalizations since 2002; (2) had a baseline of 3-4 bowel movements per day, with 7 per day more recently; and (3) experienced fatigue, arthralgias, occasional blurred vision and variable weight as a result of his Crohn's Disease, particularly when he was more physically active.  Given

---

[2] Mr. Baca weighed 147 pounds when he was discharged from the Army in 2004.

this activity and concern of extraintestinal manifestations, the examining physician prescribed a prednisone burst and indicated Mr. Baca may need Remicade in the next two weeks if his symptoms had not improved.  In March 2006, after he had started Remicade, Mr. Baca was admitted to the VA hospital for Remicade Serum Sickness.

44.     After his hospitalization, in March 2006, Mr. Baca presented to the VA with 3 days of abdominal cramping, increased diarrhea, 10-12 episodes of diarrhea per day, and nausea and vomiting approximately 4-5 times a day.  A CT scan of Mr. Baca's abdomen showed "wall thickening within the cecum and terminal ileum consistent with active Crohn's Disease" as well as a colonoscopy that showed Crohn's Disease.  Mr. Baca has experienced no change in the ebb and flow of his disease and continues to struggle with exacerbations of his Crohn's Disease to this day.

### *Mr. Baca's PDBR Application and Final Decision*

45.     In August 2020, Mr. Baca applied to the PDBR seeking to increase his rating for his Crohn's Disease.  In his application he consented to the release of his VA records to the PDBR, which included his recurrent hospitalizations, intestinal and extraintestinal exacerbations, and a CT scan and colonoscopy that both indicated Crohn's disease.  On January 18, 2022, the PDBR denied Mr. Baca's application.  The PDBR conflated the term "exacerbations" with hospitalization and based its denial on the fact that "at the time of TDRL removal, the condition had been in remission for a significant period of time.  The STR (Service Treatment Record) demonstrated one possible exacerbation that occurred in May 2006, 9 months after TDRL removal.  There was no evidence of frequent exacerbations corelating to moderately severe disease activity."  The PDBR supported its decision with the following alleged facts: (1) that there was allegedly no VA examination proximate to separation; (2) Mr. Baca's TDRL examination noted that he was in clinical remission and indicated no bouts of diarrhea, bloody stools, abdominal pain, and weight

loss; (3) his physical examination allegedly showed normal general appearance and non-tender abdomen; and (4) Mr. Baca had allegedly been off Crohn's medication for a year and in remission for 2 years.

46. The PDBR's decision contained multiple fundamental errors including minimizing and ignoring evidence that contradicted its conclusions and misapplying or ignoring governing law.

47. First, the PDBR's finding that there was no VA examination proximate Mr. Baca's separation was wrong. Mr. Baca had his VA C&P examination on September 13, 2005, less than one year before his removal from the TDRL on August 17, 2005.

48. Second, the PDBR should have particularly considered the findings from his VA C&P examination which resulted in the VA awarding him a 30% disability rating for his Crohn's disease. For example, at the time of his disability rating, the VA explicitly recognized the ongoing nature of his Crohn's disease by documenting his extensive medical history, including his recurrent hospitalizations (8 hospitalizations in 2002, 3 hospitalizations in 2003, and 1 hospitalization and 1 emergency room visit in 2004).

49. Third, the PDBR overlooked critical evidence from Mr. Baca's TDRL examination where the examiner recommended that he receive follow-up care within four months, indicating that his condition with Crohn's disease was not stable. Based on this recommendation for follow-up care at Mr. Baca's TDRL examination, the PDBR should have also considered the additional medical care he received related to his Crohn's disease diagnosis following the TDRL examination. For example, the PDBR should have considered reports from the follow-up medical care he received for a Crohn's exacerbation in December 2005, almost exactly four months after his discharge, which documented his "chronic nausea, vomiting, diarrhea, or constipation and

"unplanned … weight loss." The PDBR should have also considered his condition after his March 2006 hospitalization when he presented with acute systems of Crohn's disease and both a CT scan and colonoscopy showed that he had Crohn's disease.

50.    Fourth, the PDBR decision incorrectly noted that Mr. Baca's visit to the emergency room on August 9, 2005 was solely due to appendicitis and failed to acknowledge the relationship between appendicitis and Crohn's disease.

## COUNT I

### Violation of the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.*

51.    Mr. Baca hereby incorporates by reference all allegations set forth in the preceding paragraphs as if fully set forth herein.

52.    Under the APA, 5 U.S.C. § 706(2), this Court must "hold unlawful and set aside agency action, findings, and conclusions" that are arbitrary, capricious, unsupported by substantial evidence, or otherwise not in accordance with law. "Arbitrary-and-capricious" review applies to PDBR decisions. *See Sissel*, 77 F.4th at 946-47.

53.    For agency action to satisfy the "arbitrary and capricious" standard, the agency must have engaged in "reasoned decisionmaking." *Judulang v. Holder*, 565 U.S. 42, 53 (2011). That means the agency "must explain the evidence which is available[] and must offer a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)); *see also Butte Cnty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) ("[T]he agency must explain why it decided to act as it did." (citing *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001))).

54.    The agency must also "reasonably reflect upon the information contained in the record and grapple with contrary evidence." *Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630, 638

(D.C. Cir. 2017).  And an agency "has not engaged in reasoned decisionmaking if it . . . did not 'engag[e] the arguments raised before it.'"  *Am. Pub. Gas Ass'n v. United States Dep't of Energy*, 22 F.4th 1018, 1025 (D.C. Cir. 2022) (quoting *NorAm Gas Transmission Co. v. FERC*, 148 F.3d 1158, 1165 (D.C. Cir. 1998)).

55.    The "substantial evidence" standard also requires that the "administrative record . . . contain[] 'sufficient evidence' to support the agency's factual determinations."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citation omitted).  But "[e]vidence that is substantial viewed in isolation may become insubstantial when contradictory evidence is taken into account."  *Landry v. FDIC*, 204 F.3d 1125, 1140 (D.C. Cir. 2000) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *Johnson v. OTS*, 81 F.3d 195, 204 (D.C. Cir. 1996)).  So "an agency cannot ignore evidence that undercuts its judgment; and it may not minimize such evidence without adequate explanation."  *Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018) (citing cases).

56.    An agency must also abide by its own regulations and established procedures in making its decisions.  *See Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (it is "'axiomatic' . . . 'that an agency is bound by its own regulations'" (quoting *Panhandle E. Pipe Line Co. v. FERC*, 613 F.2d 1120, 1135 (D.C. Cir. 1979)).  In other words, the agency must apply the law.  Similarly, "[a] fundamental norm of administrative procedure requires an agency to treat like cases alike."  *Consol. Edison Co. of New York, Inc. v. FERC*, 45 F.4th 265, 279 (D.C. Cir. 2022) (citation omitted); *see also Colo. Interstate Gas Co. v. FERC*, 850 F.2d 769, 774 (D.C. Cir. 1988) ("the Commission's dissimilar treatment of evidently identical cases . . . seems the quintessence of arbitrariness and caprice").

57.    The PDBR's January 18, 2022 decision constitutes a final "agency action" under the APA.  Mr. Baca's unsuccessful appeal to the PDBR was the last available administrative remedy for review of his disability rating.

58.    Mr. Baca's APA claim accrued on the date of the PDBR's final agency action and is ripe for review by this Court.

59.    The PDBR's decision is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, unwarranted by the facts, and otherwise not in accordance with law.

60.    The PDBR's decision should be found arbitrary, capricious, contrary to law and unsupported by substantial evidence because it relies on "too stringent" a standard.  *Sissel v. Wormuth*, 462 U.S. App. D.C. 275, 282, 77 F.4th 941, 948 (2023) (vacating the Board's decision where it added the word "significantly" before contribute, making the standard too stringent to be lawful). Gastrointestinal disease exacerbations are defined by the VA as manifestations of abdominal pain, bloating, constipation, diarrhea, vomiting, and nausea.  However, the PDBR unlawfully equated exacerbations to hospitalizations, denying Mr. Baca a 30 percent rating because he allegedly only suffered from "one possible exacerbation … in May 2006, 9 months after TDRL removal," when he was discharged from the hospital.  Here, like in *Sissel*, the Board applied too stringent of a standard.  Exacerbations are not hospitalizations; they can be bouts of abdominal pain, bloating, constipation, diarrhea, vomiting, and nausea. *See also* 38 C.F.R. § 3.340 (distinguishing between hospitalization and exacerbations).

61.    The PDBR's decision repeatedly minimizes, ignores, or rejects evidence that undermines its decision without explanation.  For example, the PDBR erroneously found that there was no VA examination proximate Mr. Baca's separation and thus failed to grapple with the VA's 30% disability rating and examination findings related to Mr. Baca's Crohn's disease.  In

particular, the PDBR failed to consider that at the time of Mr. Baca's disability rating, the VA explicitly recognized the full disability picture of Mr. Baca's Crohn's disease by documenting his extensive medical history, including his recurrent hospitalizations (8 hospitalizations in 2002, 3 hospitalizations in 2003, and 1 hospitalization and 1 emergency room visit in 2004).

62.    The PDBR also disregarded contradictory evidence from Mr. Baca's TDRL examination and additional follow-on care for his Crohn's disease. For example, the PDBR relied heavily on the VA's finding of stability while disregarding the very basis for the VA's 30 percent rating. It then compounded this error by cherry-picking facts from Mr. Baca's TDRL examination to support its 10 percent rating. For example, while the PDBR emphasized the examiner's note that Mr. Baca, at the day of his exam, did not have abdominal pain or diarrhea, it failed to account for the examiner's explicit recommendation that Mr. Baca receive follow-up care within four months—a clear indication that his condition was not necessarily captured by a single examination and was likely to worsen. At a minimum, this recommendation should have prompted the PDBR to assess whether his removal from the TDRL was premature and, if so, to consider his medical history during the full period his TDRL could have been extended.

63.    Furthermore, the PDBR also failed to consider the findings from the care he received for his Crohn's disease diagnosis following the TDRL examination. In particular, the PDBR failed to consider medical reports from a Crohn's exacerbation Mr. Baca experienced in December 2005, almost exactly four months after his discharge, which documented his "chronic nausea, vomiting, diarrhea, or constipation and "unplanned … weight loss." The PDBR also failed to consider Mr. Baca's condition after his March 2006 hospitalization when he presented with acute systems of Crohn's disease and both a CT scan and colonoscopy confirmed his Crohn's disease diagnosis.

64.    The PDBR decision also failed to consider the known relationship between Crohn's disease and appendicitis when it found that Mr. Baca's visit to the emergency room on August 9, 2005 was solely due to appendicitis.

65.    The PDBR's failure to address all of this contradictory evidence renders its decision arbitrary and capricious.

66.    The PDBR's decision is also "not in accordance with law," § 706(2)(A), because the PDBR violated DoD Instruction 6040.44, Enclosure 3 § 4(a)(5), which states that the PDBR must:

> (a) Compare any VA disability rating for the specifically military-unfitting condition(s) with the PEB combined disability rating; and
>
> (b) Consider any variance in its deliberations and any impact on the final PEB combined disability rating, particularly if the VA rating was awarded within 12 months of the former Service member's separation.

67.    Therefore, under DoD instruction 6040.44, the PDBR's "task [is] not merely to acknowledge the VA's ratings, but to evaluate and rate them and, if the Board ultimately disagree[s] with them, to say why." *U-Ahk- Vroman-Sanchez*, 2021 WL 394811, at *7. In Mr. Baca's case, the PDBR met neither of these requirements in its determination because it completely ignored the VA's disability rating when it erroneously found that no VA examination occurred proximate to separation.

68.    Mr. Baca received a 30% disability rating from the VA when he was discharged from active duty, and his September 13, 2005 VA C&P exam that resulted in this rating was less than 12 months before his removal from the TDRL on August 17, 2005. Therefore, the PDBR both failed to "compare" his 30% VA disability rating to the 10% PEB rating and failed to "consider the variance in its deliberations" between the VA and PEB disability ratings. DoD

Instruction 6040.44, Enclosure 3 § 4(a)(5). Thus, "[t]he PDBR accordingly fell short of its obligation under DoD Instruction 6040.44 not only to acknowledge the VA's ratings, but to evaluate and weigh them, in a fair and conscientious manner. Failure to do so was contrary to law." *Crockwell v. Austin*, 2024 U.S. Dist. LEXIS 55955, *49 (D.D.C. Mar. 28, 2024) (internal quotations removed).

69.     The PDBR's decision further violates the VASRD because when reasonable doubt arises regarding the degree of disability, such doubt is to be resolved in favor of the veteran. 38 C.F.R § 4.3. Moreover, if there is a question as to which of two evaluations must be applied, the higher evaluation must be assigned if the disability more nearly approximates the criteria required for the higher rating. 38 § C.F.R. 4.7. The PDBR violated the VASRD because it failed to resolve the discrepancy between Mr. Baca's VA rating and PEB rating in favor of Mr. Baca.

70.     As the result of the PDBR's unlawful decision, Mr. Baca was and continues to be deprived of the benefits of the disability retirement to which he is entitled.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Francisco Baca respectfully requests the following relief:

(A)     An Order setting aside the PDBR's January 18, 2022 decision as arbitrary, capricious, unwarranted by the facts, or otherwise not in accordance with law to the extent it adopted the PEB's 10% disability and denied Mr. Baca a permanent disability retirement;

(B)     Order the Secretary to remand Plaintiff's case to the Army Board for Correction of Military Records with instructions to apply the proper legal standards; and;

(C)     An award of all costs and reasonable attorneys' fees; and

(D)     Such other and further relief the Court may deem just and proper.

Dated:  May 30, 2025                    Respectfully submitted,

*/s/ Michael A. David*
Michael A. David (DC Bar No. 974415)
Hannah Fan (*pro hac vice forthcoming*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004-1304
Phone:      (202) 637-2200
Fax:          (202) 637-2201
Email:      michael.david@lw.com
                 hannah.fan@lw.com

Katie Cannatella (*pro hac vice forthcoming*)
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email: katie.cannatella@lw.com

Rochelle Bobroff (DC Bar No. 420892)
Esther Leibfarth (DC Bar No. 1016515)
rochelle@nvlsp.org
esther@nvlsp.org
NATIONAL VETERANS LEGAL
SERVICES PROGRAM
1100 Wilson Blvd., Suite 900
Arlington, VA 22209
Tel: (202) 621-5681
Fax: (202) 328-0063

*Counsel for Plaintiff Francisco Baca*